IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BEACON SALES ACQUISITION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-1820 (RDA/WEF) |
| | ) | |
| CAMERON ASHLEY BUILDING | ) | |
| PRODUCTS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Plaintiff Beacon Sales Acquisition, Inc.'s Emergency Motion for a Temporary Restraining Order (Dkt. 9) ("TRO"). Considering the Motion and accompanying exhibits and declarations together, along with Defendants' Opposition (Dkt. 14), the Supplemental Briefing (Dkts. 25, 26, 28, 30, 31) and the arguments and testimony heard during the November 5, 2025 hearing, this Court DENIES Plaintiff's Motion for the reasons that follow.

## I. BACKGROUND

### A. Factual Background

#### i. *Facts Derived from the Briefing*

For purposes of this case, Plaintiff does business as Dealers Choice. Dkt. 10 at 6.[1] Plaintiff has sued two former employees, Defendants Derek Kacey Brown and Anthony Todd Bozeman, as well as a competitor, Defendant Cameron Ashley Building Products, Inc. ("CABP"). *Id.*

---

[1] All page numbers refer to the CM/ECF assigned pages unless otherwise indicated.

Since 1993, Dealers Choice has delivered support and materials to local home improvement suppliers and lumberyards. *Id.* at 8. Dealers Choice buys materials directly from manufacturers and sells those materials to small retailers or local building material suppliers who then sell to the end user. *Id.* Dealers Choice has 24 branches located throughout the South and Midwest of the United States. *Id.* Defendants assert that, in April 2025, QXO, Inc. completed a hostile takeover of Plaintiff and that Plaintiff underwent significant organizational changes. Dkt. 14 at 9. These organizational changes included removing and replacing senior level executives. *Id.*

Brown was Dealers Choice's Regional Vice President for Southeast. Dkt. 10 at 9. He had managerial responsibility for all of Dealer Choice's branches in Alabama, Florida, Georgia, Kentucky, Louisiana, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia. *Id.* Brown supervised 109 employees and was responsible for millions of dollars in annual sales. *Id.*

On October 1, 2018, in connection with a promotion, Brown executed a New Hire Non-Competition/Non-Solicitation/Confidentiality Agreement. Dkt. 10-2 (the "Brown Agreement"). Brown asserts that he entered into the Brown Agreement when he was promoted to Branch Manager of a single branch in Tifton, Georgia. Dkt. 14 at 9; Dkt. 14-1 ¶ 5. He reports that he was thereafter moved to Tennessee and was promoted again to Market Manager where he was responsible for distribution centers in Tennessee, Ohio, Kentucky, and Michigan. Dkt. 14 at 9. Brown asserts that he did not sign a new agreement following any subsequent promotions. *Id.*

Specifically, the Brown Agreement provided that:

Employee agrees that for a period of twelve (12) months following the termination of Employee's employment for any reason, including resignation by Employee or termination by Beacon for any reason, that Employee will not directly or indirectly engage in the Roofing Distribution Business anywhere in the Territory other than

on the Company's behalf. To "engage" in a business in the Territory means (a) to render services in or with respect to the Territory for that business, or (b) to own, manage, operate or control (or participate in the ownership, management, operation or control of) an enterprise engaged in that business in the Territory. "Territory" means any location within a seventy-five (75) mile radius of any branch of the Company which you manage or work from at the time of your termination. "Roofing Distribution Business" means any business involving the distribution of (i) commercial and/or residential roofing materials, (ii) shingles, siding, windows, lumber, waterproofing products, insulation or sheet metal, or (iii) any other products or services sold or provided by Beacon as of the date of the Employee's separation of employment.

*Id.* The Brown Agreement also contained non-solicitation provisions:

Employee agrees that for a period of twelve (12) months following the termination of Employee's employment that Employee will not directly or indirectly (a) solicit any Customer to purchase from any person other than the Company any service or product offered by the Company; (b) suggest that any Customer of Beacon or its affiliates (including those of companies acquired by Beacon) discontinue any business relationship with Beacon or its affiliates; (c) suggest that any Customer of Beacon or its affiliates give its business to any other person, firm, corporation, partnership, association, entity, or other organization; (d) induce or attempt to induce any Employee, consultant, contractor, or representative or agent of Beacon or its affiliates to terminate their employment or other relationship with Beacon or its affiliates; (e) interfere with or disrupt the relationship of Beacon or its affiliates with its Employees, consultants, contractors, representatives or agents by hiring or soliciting the employment (or soliciting to retain the services) of any Employee, agent, consultant, contractor, or representative of Beacon or its affiliates. "Customer" means any person who purchased any product or service from the Company during the term of this Agreement or the 12 months prior to the date of Employee's separation of employment. For the purposes of this section, "Employee" means any person who is an employee of the Company as of the time of the solicitation in question.

*Id.* Finally, the Brown Agreement also provides that Brown "will be in possession of Beacon's confidential information" and that Brown agrees to "maintain all Confidential Information in strict confidence" and "not disclose any Confidential Information to anyone outside of Beacon." *Id.*

Bozeman was Dealers Choice's Sales Director of National Accounts. *Id.* at 12. In that role, Bozeman serviced clients in more than 20 branches in Alabama, Florida, Georgia, Kentucky, Louisiana, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia. *Id.*

On November 6, 2018, in connection with a promotion, Bozeman executed a New Hire Non-Competition/Non-Solicitation/Confidentiality Agreement.    Dkt. 10-3 (the "Bozeman Agreement").  Specifically, the Bozeman Agreement provided that:

> Employee agrees that for a period of twelve (12) months following the termination of Employee's employment for any reason, including resignation by Employee or termination by Beacon for any reason, that Employee will not directly or indirectly engage in the Roofing Distribution Business anywhere in the Territory other than on the Company's behalf. To "engage" in a business in the Territory means (a) to render services in or with respect to the Territory for that business, or (b) to own, manage, operate or control (or participate in the ownership, management, operation or control of) an enterprise engaged in that business in the Territory. "Territory" means any location within a seventy-five (75) mile radius of any branch of the Company which you manage or work from at the time of your termination. "Roofing Distribution Business" means any business involving the distribution of (i) commercial and/or residential roofing materials, (ii) shingles, siding, windows, lumber, waterproofing products, insulation or sheet metal, or (iii) any other products or services sold or provided by Beacon as of the date of the Employee's separation of employment.

*Id.*  The Bozeman Agreement further provides:

> Employee agrees that for a period of twelve (12) months following the termination of Employee's employment that Employee will not directly or indirectly (a) solicit any Customer to purchase from any person other than the Company any service or product offered by the Company; (b) suggest that any Customer of Beacon or its affiliates (including those of companies acquired by Beacon) discontinue any business relationship with Beacon or its affiliates; (c) suggest that any Customer of Beacon or its affiliates give its business to any other person, firm, corporation, partnership, association, entity, or other organization; (d) induce or attempt to induce any Employee, consultant, contractor, or representative or agent of Beacon or its affiliates to terminate their employment or other relationship with Beacon or its affiliates; (e) interfere with or disrupt the relationship of Beacon or its affiliates with its Employees, consultants, contractors, representatives or agents by hiring or soliciting the employment (or soliciting to retain the services) of any Employee, agent, consultant, contractor, or representative of Beacon or its affiliates. "Customer" means any person who purchased any product or service from the Company during the term of this Agreement or the 12 months prior to the date of Employee's separation of employment. For the purposes of this section, "Employee" means any person who is an employee of the Company as of the time of the solicitation in question.

*Id.*    Finally, the Bozeman Agreement also provides that Bozeman "will be in possession of Beacon's confidential information" and that Bozeman agrees to "maintain all Confidential

4

Information in strict confidence" and "not disclose any Confidential Information to anyone outside of Beacon." *Id.*

Brown resigned from Dealers Choice on October 15, 2025. *Id.* at 14. He notes that, as part of the restructuring following QXO's takeover, his Market Manager position was eliminated and he was offered the position of Regional Vice President. Dkt. 14 at 9. Brown reports that he did not accept that position or sign any new agreements related to the position because the compensation offered was not commensurate with the increased level of responsibility and scope. *Id.* Brown asserts that, despite not accepting the promotion, QXO internally changed his title and began assigning him Regional Vice President level duties. *Id.* Brown asserts that he resigned due to management turnover, hostile executive conduct, unrealistic financial expectations, and harmful directives. *Id.* He states that he was not solicited to leave Dealers Choice by any other Dealers Choice employees and did not solicit others to leave. *Id.*

Bozeman then resigned on October 17, 2025. Dkt. 10 at 14. Bozeman reports that, prior to working for Dealers Choice, Bozeman worked for CABP for over a decade. Dkt. 14 at 10; Dkt. 14-2. Bozeman reports that he maintained his relationships with individuals at CABP during his tenure with Dealers Choice and he was recruited to return several times. *Id.* He asserts that he decided to leave after seeing how new leadership treated people and that he reached out to CABP to discuss potential employment. *Id.* Bozeman asserts that he was not solicited to leave Dealers Choice and that he did not solicit others to leave. *Id.*

Brown and Bozeman now work for CABP. Dkt. 10 at 14. CABP is a wholesale distributor of roofing, insulation, drywall, siding, and other specialty building products with a network of 65 distribution centers throughout the United States. *Id.* Plaintiff alleges that CABP is aware of Dealers Choice's restrictive covenants in its agreements with its employees and that CABP has

targeted the entirety of senior leadership at Dealers Choice. *Id.* CABP asserts that Brown has been hired as a Direct Sales Manager and not in an operational role. Dkt. 14 at 12; Dkt. 14-4. It reports that Brown's sales territory includes only states that are more than 75 miles from the locations Brown oversaw for Dealers Choice in Tennessee, Kentucky, Ohio, and Michigan from 2019 to mid-2025. *Id.* CABP asserts that Bozeman was hired by CABP as Category Merchant Director, which is not a sales position. *Id.* It reports that, in this role, Bozeman deals with manufacturers, suppliers, and vendors and does not contact customers. *Id.*

In addition to Brown and Bozeman, Plaintiff asserts that a Regional Sales Manager in the Southeast Region, Griffin Hamsley, and a Regional Manager in the Mid-West Region, Paul Berglin, were also recruited to leave Dealers Choice for CABP. Dkt. 10 at 6. With respect to Hamsley, CABP reports that he has been hired as a District Sales Manager with responsibility over Virginia, Kentucky, Tennessee, North Carolina, and South Carolina – all states for which he had no responsibility for Dealers Choice. Dkt. 14 at 12; Dkt. 14-4. Within days of leaving Dealers Choice, Hamsley left a voicemail for a Dealers Choice customer who had a sales relationship with Brown, advising the customer that he had formerly worked at Dealers Choice and now worked at CABP. Dkt. 10 at 9. Hamsley provided his phone number and requested that the customer return his call. *Id.* Plaintiff alleges that Brown shared this customer information with Hamsley for the purpose of indirectly soliciting the customer. *Id.* Plaintiff also believes that Brown and Bozeman have contacted numerous other Dealers Choice customers, either directly or indirectly, on behalf of CABP. *Id.* CABP reports that the customer contacted by Hamsley was already a CABP customer and that Hamsley had no contact with this customer at Dealers Choice. *Id.* at 12.

Hamsley also submitted a declaration. Dkt. 14-3. Hamsely was in a sale role with Dealers Choice with responsibility in Alabama, Florida, Georgia, Louisiana, and Mississippi. Dkt. 14 at

11.   Hamsley reports that, in late August 2025, a CABP representative who had previously attempted to recruit him reached out again.  *Id.*  Hamsley reports that he was not solicited to leave by any other Dealers Choice employees and would have come to CABP regardless due to what he viewed as the toxic and stressful workplace created by QXO.  *Id.*  He further asserts that he did not solicit others to leave Dealers Choice.  *Id.*  Hamsley also states that he did not receive any confidential information about this customer from Brown.  *Id.* at 12.

CABP reports that it has a strict policy regarding the non-use and non-disclosure of confidential and proprietary information of former employers.  *Id.*  CABP further requires that new hires to sign a letter agreement acknowledging they do not have and will not use any confidential information of their former employers.  *Id.*

ii.  *Facts Derived from Hearing*

At the November 5, 2025 hearing, the Court heard testimony from a single witness from Dealers Choice: Eric Zadrozny.  Although some of Mr. Zadrozny's testimony involved speculation as to what he believes may have occurred with Brown and Bozeman, Mr. Zadrozny was a credible and thorough witness who testified to his own knowledge to the best of his ability.

Mr. Zadrozny is Vice President of sales for QXO's Southeast Division.  Dkt. 32 at 11:3-4. As Mr. Zadrozny explained, Dealers Choice buys lumber or roofing materials from a manufacturer and then sells them to rural businesses or contractors.  *Id.* at 13:17-14:1.  Mr. Zadrozny testified that, as a Regional Vice President, Brown was responsible for the southern half of the United States, including 11 branches, and that Brown was responsible for over $200 million in revenue in the past year.  *Id.* at 14:8-21.   Mr. Zadrozny also testified that Brown had responsibility for facilities in: (i) Cincinnati, Ohio; (ii) Leitchfield, Kentucky; and (iii) Nashville, Tennessee.  *Id.* at 17:6-24.  With respect to Bozeman, Mr. Zadrozny testified that Bozeman was part of the "key and

national account team" where he was the single point of contact for some of the largest accounts. *Id.* at 18:4-10. In that role, Bozeman had an understanding of go-to-market strategies and a rebate system and would have relationships with vendors and know who has authority to make certain deals. *Id.* at 19:15-20. He asserted that information regarding rebates and pricing would all be confidential and proprietary and that Dealers Choice took steps to protect such information. *Id.* at 20:2-21:3.

Mr. Zadrozny testified that Dealers Choice has about eight or nine key leaders and that four of them (Bozeman, Hamsley, Brown, and Paul Berglin) had resigned and went to CABP. *Id.* at 18:13-25. Mr. Zadrozny noted that Hamsley had been a sales manager but was just promoted to sales director for the southern region and that Berglin was in charge of the Dealers Choice north division. *Id.* at 21:10-22:2. Mr. Zadrozny noted that most of Dealers Choice's facilities are east of the Mississippi. *Id.* at 22:5-8.

Mr. Zadrozny asserted that CABP is a competitor of Dealers Choice because they are also a two-step supplier. *Id.* at 22:9-13. He testified that Brown and Bozeman had access to confidential pricing and rebate information and that such information, in the hands of CABP, could damage Dealers Choice. *Id.* at 25:5-17. Mr. Zadrozny acknowledged that it would not be unusual for a company to contract with both Dealers Choice and CABP. *Id.* at 26:2-14.

With respect to the resignations of persons leaving for CABP, Mr. Zadrozny testified: "So when I saw Paul Berglin leave, I said, okay, people sometimes leave jobs. Then the next week when I see Griffin Hamsley leave, and then Kacey Brown leave the next day, all of sudden, like, all of our antennas are going up and going, like, what's going on. You start talking to people and you find multiple leaders inside of Dealer's Choice [sic] had all been approached by Cameron Ashley." *Id.* at 29:2-8. Mr. Zadrozny testified that, when Bozeman left, he told Bozeman: "You

have a noncompete.  How is that going to work?" *Id.* at 30:14-15.  Bozeman's response was apparently that he was going to be "on procurement" and that "[w]e'll figure it out." *Id.* at 30:16-21.  Mr. Zadrozny testified that "it didn't pass the smell[] test to me to be honest with you" and that it did not "feel right." *Id.* at 30:22-31:2.

Mr. Zadrozny indicated that he learned that CABP was offering "a lot more" – close to a "20, 25 percent bump in base." *Id.* at 31:19-32:2.  When asked how these departures had impacted the business, Mr. Zadrozny acknowledged that it was "too short of a window to know." *Id.* at 32:12-16.  In response to a question asking him to speculate, Mr. Zadrozny asserted that the harm could be "[t]ens of millions of dollars" and could also impact "the vendor relationships that each of them had." *Id.* at 32:17-21; *id.* at 37:4-9.

On cross-examination, Mr. Zadrozny acknowledged that Brown had only been in the Regional Vice President role for approximately three months and that, prior to that time, Brown did not have anything to do with Georgia, Florida, Alabama, Louisiana, Mississippi, or Texas. *Id.* at 43:17-44:1.  With respect to Bozeman's new role, Mr. Zadrozny testified that, although Bozeman was hired by CABP for procurement, Mr. Zadrozny agreed with what Bozeman told him: that it is just "another way of selling." *Id.* at 46:4-15.

With respect to pricing, when asked whether pricing changed on each order, Mr. Zadrozny testified that "[i]t depends on what customer it's for," and acknowledged that it could be "fluid." *Id.* at 47:16-48:6.  He acknowledged that specific pricing information could become stale quickly but testified that other information regarding "how we were going to market, what kind of asks we were having for manufacturers, and which was typically approved, which ones were typically not approved" would still be confidential. *Id.* at 48:10-16.  When asked whether he personally had any evidence that Brown or Bozeman took any confidential information with them, Mr. Zadrozny

acknowledged that he did not. *Id.* at 48:17-49:7. Mr. Zadrozny asserted that the knowledge of the business strategies could still be taken because it is based on what they remember. *Id.* at 49:8-19. Mr. Zadrozny also acknowledged that he was not aware of any specific communication between Brown and Bozeman about leaving for CABP. *Id.* at 51:3-7. Mr. Zadrozny also testified that he personally heard the voicemail from Hamsley to a Dealers Choice customer, but that he did not know about the customer's reaction to the voicemail. *Id.* at 52:14-25. Mr. Zadrozny testified that the customer was located in Ohio, which was outside of Hamsley's territory. *Id.* at 54:4-14. He acknowledged that he was not aware of any evidence that Hamsley learned anything about the customer while employed by Dealers Choice. *Id.* at 54:18-55:5.

With respect to solicitation of customers, Mr. Zadrozny testified: "We believe, based on that voicemail, it would be at least the first one that we have that they are reaching out to customers." *Id.* at 56:12-16. Mr. Zadrozny further explained: "So far that's the only thing we have [as] proof, but . . . the strategy that likely is in place right now is to take the knowledge that these people have to advance your roofing business. And so, that's – they are not going there do something other than that." *Id.* at 56:19-25. Mr. Zadrozny conceded that he did not have evidence of that strategy or any evidence concerning solicitation of other customers. *Id.* at 57:1-12.

On redirect, Mr. Zadrozny clarified that Brown was responsible for the Ohio region and the customer Hamsley contacted was in Brown's zone. *Id.* at 61:3-19.

iii. *Facts Derived from Supplemental Briefing*

After the evidentiary hearing, Dealers Choice completed its initial forensic review of devices and systems used by Brown and Bozeman. Dkt. 25-1. This forensic review demonstrated that, during the period when Brown was working for Dealers Choice, Brown accessed information on Dealers Choice's server. *Id.* ¶ 8. On September 17, 2025, Brown accessed a document entitled

10

"NCA Kacey Brown," which Dealers Choice asserts is the Brown Agreement, and emailed it to a personal email address. *Id.* ¶ 9; Dkt. 25 at 1 n.1. Following that September 17, 2025 date, Brown accessed the documents entitled: (i) "SkaggsandJoe.png"; (ii) "Check Request.pdf"; (iii) "8.1.24 Matrix\Certainteed895PriceSheet.pdg"; (iv) "4.1.2025 Matrix\CTLeitchfield 4.1.2025"; (v) "DJI_0053.mp4"; (vi) "IMG_0047.jpg"; (vii) "4.1.2025 Matrix\GAF North Q4 Accessory BA.pdf"; (viii) "SOUTHEAST – PRICE VS VOLUME (DEALERS CHOICE).xlsx"; (ix) "SRS TEXAS.pdf"; and (x) "4.1.2025 Matrix\GAF Lansing 4.1.2025.pdf." Dkt. 25-1 ¶ 8.

Dealers Choice also provided an inventory of documents accessed by Bozeman, but those do not include any documents accessed in the month prior to his resignation. *Id.* ¶ 14. The last item reflected in the forensic review with respect to Bozeman occurred on September 17, 2025 – one month before his resignation – when he accessed a document titled "Inventory2025.xlsx." *Id.* In the weeks prior to that September 17, 2025 date, Bozeman accessed documents relating to payouts, rebates, and pricing. *Id.* ¶¶ 14, 15.

In its brief, Dealers Choice also alleges that it "has learned that Bozeman arranged a meeting with Dealers Choice's largest vendor and sought to convince this vendor to start selling through CABP." Dkt. 25 at 3. This allegation, however, is unsupported by a declaration, affidavit, or explanation regarding how Dealers Choice came to learn such information. Dealers Choice represents its "*belief* that this vendor does not currently sell roofing materials through CABP." *Id.* (emphasis added). Dealers Choice also represents that the "full extent of Bozeman's use of Dealers Choice confidential information in those discussions remains unknown" and that "[a]dditional discovery is necessary to determine *whether* Bozeman relied on or disclosed any confidential information belonging to Dealers Choice during these communications." *Id.* at 3 n.1 (emphasis added).

11

Dealers Choice then filed a further supplemental brief, noting that, in connection with its case against Hamsley in another jurisdiction, Hamsley had testified. Dkt. 28.[2] In that proceeding, Hamsley testified: "Kacey Brown told me that he had a customer that he'd had a very good relationship with over the past six years. They had become friends. He obviously could not contact him, and he asked them (sic) if I would contract them and let him know that if he has tried to reach out to him that's why he's not able to get to him." Dkt. 28-1 at 24:24-25:4. Hamsley further testified that he did reach out to the customer and told the customer: "Listen, Kacey would like – wanted me to reach out to let you know that he's no longer with Dealers Choice, he has a new phone number, and that's why if you tried to get in touch with him you haven't been able to." *Id.* at 25:11-15. Hamsley asserted: "No business was discussed." *Id.* at 25:17. Hamsley further testified that he told the customer that "Kacey cannot talk business" with the customer. *Id.* at 25:23-24. Hamsley acknowledged that he only found out that the customer was a customer of CABP "after the fact." *Id.* at 26:1. And he stated that he has not talked with Brown about that customer since he made the call. *Id.* at 26:15-17. Hamsley asserted that he did not view the customer's phone number as Dealers Choice's confidential information. *Id.* at 26:18-20.

## B.  Procedural Background

Dealers Choice filed its Complaint on October 23, 2025. Dkt. 1. On October 31, 2025, Dealers Choice filed its Emergency Motion for a TRO. Dkt. 9. On November 3, 2025, Defendants

---

[2] Docket entry 28 appears to have been filed twice: as docket entry 28 and docket entry 30. *See* Dkts. 28, 30. They appear, however, to be the same documents. *Id.*

filed their Opposition. Dkt. 14. On November 4, 2025, Defendants files an Emergency Motion to Quash Subpoenas. Dkt. 16.

On November 5, 2025, the Court held a hearing on both Emergency Motions. Dkt. 19. The Court granted the Emergency Motion to Quash Subpoenas. *Id.*; Dkt. 20. The Court took the Emergency Motion for a TRO under advisement and set a schedule for further briefing. Dkt. 19.

On November 12, 2025, the parties filed Supplemental Briefs. Dkts. 25, 26. On November 14, the parties filed Replies. Dkts. 28, 30, 31.

## II. STANDARD OF REVIEW

A motion for a temporary restraining order and a motion for a preliminary injunction are both subject to the requirements of Federal Rule of Civil Procedure 65(b). "While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). A grant of injunctive relief requires the movant to establish: (1) that the plaintiff will likely succeed on the merits; (2) that the plaintiff will likely suffer irreparable harm if the injunction is denied; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III. ANALYSIS

The Court, like the parties, focuses its analysis primarily on the likelihood of success element of the *Winter* test. Thus, the Court first considers Plaintiff's likelihood of success on each of the claims that it alleges supports its claims for injunctive relief. The Court then turns to the remaining *Winter* factors; the analysis of which relate closely to one another.

A.      Likelihood of Success on the Merits

Plaintiff has asserted eleven different counts against Defendants, but Plaintiff does not rely on all of those counts to support its request for injunctive relief.  Rather, Plaintiff relies on the following counts to support its Emergency Motion for a TRO: (i) breach of contract (Counts II and III); (ii) tortious interference (Count IV); (iii) breach of fiduciary duty and duty of loyalty (Count XI); (iv) aiding and abetting (Counts V and VI); and (v) business conspiracy (Count IX).  As judges in this District have previously held, where multiple causes of action are alleged, "finding a likelihood of success on only one claim is sufficient to 'justify injunctive relief.'"  *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021).  Thus, the Court analyzes each claim alleged to support injunctive relief separately, but, because certain counts are related to one another, the Court may not address the claims in the same order as argued by the parties.

i.      *Breach of Contract*

In Counts II and III, Plaintiff alleges a breach of contract claim against Brown and Bozeman respectively.  Dkt. 1 ¶¶ 114-137.  In asserting these breaches of contract, Plaintiff asserts that Brown and Bozeman have breached three aspects of their respective contracts: (i) the restrictive covenant or non-compete; (ii) the non-solicitation clause; and (iii) the confidentiality clause.  *Id.*  Because each of these alleged breaches relies on different facts, the Court will also analyze them separately.

a.      <u>Non-Compete</u>

The Brown and Bozeman Agreements contain identical clauses prohibiting them, for a period of 12 months, from "engag[ing] in the Roofing Distribution Business anywhere in the Territory other than on the Company's behalf."  Dkt. 10-2; Dkt. 10-3.  The Agreements define "engag[ing] in business," in part, as "render[ing] services in or with respect to the Territory for

14

that business." *Id.*[3]  The Agreements define Territory to mean "any location within a seventy-five (75) mile radius of any branch of the Company which you manage or work from at the time of your termination." *Id.*

Although the parties engage in a substantial discussion of whether Delaware or Virginia law applies to the interpretation of this provision, the Court need not reach that issue at this point because, regardless of what law applies, Plaintiff has not demonstrated that Brown or Bozeman have violated the provision.  Both Delaware and Virginia require that courts apply the plain meaning of a contractual provision like a non-compete clause.  *See, e.g.*, *Symbiont.io, Inc. v. Ipreo Holdings, LLC*, 2021 WL 3575709, at *29 (Court of Chancery of Delaware Aug. 13, 2021) ("Contractual interpretation begins with plain language."); *Quadros & Assoc. v. City of Hampton*, 268 Va. 50, 54 (2004) ("When contract terms are clear and unambiguous, a court must accord those terms their plain meaning.").  Here, pursuant to its plain language, the non-compete only applies when an employee works in the Roofing Distribution Business *and* the location of that work is within seventy-five miles of a location which that employee *worked from* or *managed* for Dealers Choice.  Here, there is no evidence that either Brown or Bozeman work for CABP at a location that is within seventy-five miles of a location that they worked from or managed for Dealers Choice.  Indeed, Plaintiff has introduced no evidence concerning from where Brown or Bozeman now work.  Even more importantly, with respect to Bozeman, Plaintiff has introduced no evidence regarding from where Bozeman worked when he worked for Dealers Choice.

If the geographic limitation within the non-compete clause is to have any meaning, then Plaintiff must establish that the seventy-five mile restriction is being violated.  The burden on a

---

[3] The other definition of engaging in business is not relevant here.

plaintiff to establish a likelihood of success on the merits is "high" and "merely providing sufficient allegations to meet the Fed. R. Civ. P. 12(b)(6) standard or *Twombly* and *Iqbal* does not show likelihood of success on the merits." *Yanko v. Rector & Visitors of Univ. of Va.*, 2025 WL 2982617, at *2 (W.D. Va. Oct. 22, 2025). Without information regarding from where Brown and Bozeman now work for CABP, the Court cannot say that the geographic scope of the non-compete is satisfied. As it stands, the only evidence at this stage of the proceedings is that Brown and Bozeman now work for CABP. This is insufficient to meet Plaintiff's burden to demonstrate a violation of the non-compete clause.[4]

Furthermore, the plain language of the non-compete clause poses another hurdle that Plaintiff has not cleared with respect to Bozeman. In the Complaint, Plaintiff alleges that Bozeman "serviced customers through branches in Alabama, Florida, Georgia, Kentucky, Louisiana, Missouri, North Carolina, South Carolina, Tennessee, Texas, and [sic] Virginia, Ohio, Wisconsin, South Dakota, Nebraska, and Massachusetts." Dkt. 1 ¶ 48. Plaintiff's brief and Mr. Zadrozny's declaration repeat the same language. Dkt. 10 at 12; Dkt. 10-1 ¶ 7. It is unclear what Plaintiff's allegations that Bozeman "serviced customers through branches" means. But here, the specific

---

[4] Brown has affirmatively asserted that his role with CABP involves sales in states that are more than 75 miles from the locations that he oversaw for Dealers Choice in Tennessee, Kentucky, Ohio, and Michigan Dkt. 14-1. One could perhaps infer from this declaration that Brown does perform work for CABP within a 75 mile radius of the locations that were part of the Southeastern region of which he was the Regional Vice President for three months – namely the locations in Alabama, Florida, Georgia, Louisiana, Missouri, North Carolina, South Carolina, Texas or Virginia. Although such inference may render allegations plausible for purposes of a motion to dismiss, drawing such inferences where Plaintiff is required to meet the high bar of demonstrating a likelihood of success would be inappropriate. *Yanko*, 2025 WL 2982617, at *2. Moreover, the Court would be unable to say from where the violation arose. Does Brown work within 75 miles of a location in one of the other states? There is no information in the record from which the Court could conclude that Brown works for CABP within 75 miles of any of the remaining locations for which he was Regional Vice President.

language of the non-compete is "manage or work from." Dkt. 10-3. It appears clear that Bozeman was not a manager – he did sales – and thus the only means of establishing that Bozeman violated the non-compete is to establish that Bozeman "worked from" one of the locations listed. But Plaintiff fails to establish that Bozeman "worked from" any one of these locations or that its allegations regarding "serviced through" satisfies that provision. It may be that "serviced through" simply refers to the customers being located in those states or it may mean something more. Plaintiff's argument in its brief suggests that it is the former, however, meaning that Bozeman did not "work from" all of the branch locations in these states, but rather that he had "national sales responsibilities because customers for which Bozeman had sales responsibility extended throughout the Restricted Territory." Dkt. 10 at 21. Plaintiff certainly could have drafted a restrictive covenant that restricted Bozeman from conducting roofing business in any state in which Bozeman serviced or sold to Dealers Choice customers, but that is not the restrictive covenant to which the parties agreed. The plain language of the non-compete in the Bozeman Agreement specifically ties the scope of the provision to seventy-five miles from locations that he "worked from" and here there is no information about from where Bozeman worked.[5]

Plaintiff's more specific allegations in its supplemental briefing fare no better. Plaintiff, in an allegation unsupported by any evidence, reports that "Dealers Choice has learned that Bozeman arranged a meeting with Dealers Choices' largest vendor." Dkt. 25 at 3. To the extent Plaintiff seeks to rely on this allegation to support its allegations that the non-compete clause has been

---

[5] In their briefs, Plaintiff attempts to broaden the geographic limits of the non-compete clause in the Bozeman Agreement even further by arguing that it "spans a reasonable 75-mile radius from any *state* from which Bozeman worked at the time." Dkt. 10 at 21 (emphasis added). This reading of the non-compete clause is not reasonable as Territory is clearly defined as "any location within a seventy-five (75) mile radius of *any branch* of the Company which you manage or work from the time of your termination."

violated, Plaintiff's claims fail, because Plaintiff fails to identify where this vendor is located or argue that it would fall within the geographic scope of the non-compete clause.

In sum, because Plaintiff has adduced no evidence that Brown or Bozeman are working for CABP within seventy-five miles of a Dealers Choice location which they managed or worked from, Plaintiff has not demonstrated a likelihood of success on the merits based on the non-compete clause.

### b.    *Non-Solicitation*

The Brown and Bozeman Agreements also contain a non-solicitation clause which precludes them, for a period of twelve months, from (i) "solicit[ing] any Customer to purchase from any person other than the Company"; (ii) "suggest[ing] that any Customer . . . discontinue any business relationship with Beacon"; and (iii) "suggest[ing] that any Customer . . . give its business to any other person, firm . . .".  Dkts. 10-2, 10-3.  The clause likewise precludes Brown and Bozeman from soliciting or interfering with Beacon's relationship with "any Employee, consultant, contractor, or representative, representative, or agent of Beacon" by inducing or attempting to induce them to "terminate their employment or other relationship with Beacon" or "by hiring or soliciting the employment" of such person.  *Id.*

In this regard, Plaintiff's claims are largely speculative.  As Mr. Zadrozny honestly testified at the hearing, Dealers Choice's evidence regarding breaches of the non-solicitation clause rests on beliefs that things did not pass "the smell[] test to me to be honest with you" and did not "feel right."  Dkt. 32 at 30:22-31:2.  Mr. Zadrozny also acknowledged that he was not aware of any specific communication between Brown and Bozeman about leaving for CABP.  *Id.* at 51:3-7. Outside of the Hamsley voicemail, Mr. Zadrozny acknowledged: "So far that's the only thing we have [as] proof, but . . . the strategy that likely is in place right now is to take the knowledge that

these people have to advance your roofing business.  And so, that's – they are not going there do something other than that." *Id.* at 56:19-25.  Mr. Zadrozny conceded that he did not have evidence of that strategy or any evidence concerning solicitation of other customers.  *Id.* at 57:1-12.

Thus, the Court is left to analyze two allegations, one with respect to Brown and one with respect to Bozeman, to determine whether Plaintiff has established a likelihood of success that Brown and Bozeman have violated the non-solicitation clause.  The allegation with respect to Brown relates to the voicemail left by Hamsley for a former customer of Brown's while Brown was at Dealers Choice.  Plaintiff's allegations regarding the voicemail are: Hamsley left a voicemail for a Dealers Choice customer who had a sales relationship with Brown, advising the customer that he had formerly worked at Dealers Choice and now worked at CABP.  Dkt. 10 at 9. Hamsley further provided his phone number and requested that the customer return his call.  *Id.* In his testimony in another jurisdiction, Hamsley testified that when he spoke with the customer he told the customer: "Listen, Kacey would like – wanted me to reach out to let you know that he's no longer with Dealers Choice, he has a new phone number, and that's why if you tried to get in touch with him you haven't been able to."  *Id.* at 25:11-15.  Hamsley asserted that "[n]o business was discussed" and that he told the customer that "Kacey cannot talk business" with the customer *Id.* at 25:17; *id.* at 25:23-24.  Missing from these allegations is any suggestion of solicitation or a breach of the non-solicitation agreement.  Although Brown indirectly contacted the customer through Hamsley, there is no evidence that Hamsley: (i) solicited the customer to purchase from CABP; (ii) suggested that the customer discontinue business with Dealers Choice; or (iii) suggested that the customer gives his business to CABP.  Dkt. 10-2.  The non-solicitation clause does not bar *contact* with Dealers Choice customers, it bars solicitation – and evidence of solicitation is missing from this case.  Indeed, the testimony from Hamsley suggests that Brown

was attempting to comply with the non-solicitation provision of the Brown Agreement. Dkt. 28-1.[6] Again it is Plaintiff's burden to establish that a violation of the non-solicitation provision took place and, although Plaintiff has established that a contact took place, Plaintiff has not established that solicitation took place.

With respect to Bozeman, again Plaintiff has not established that a solicitation barred by the Bozeman Agreement took place. The first three categories of the non-solicitation clause explicitly bar solicitation of customers. *Id.* (referring to "solicit any Customer" or "suggest that any Customer"). And, here, beyond Dealers Choice's speculation, there is no evidence that Bozeman has contacted any customers of Dealers Choice. As the declarations and testimony submitted in this case demonstrate, Bozeman is employed by CABP as a Category Merchant Director, which is not a sales position and does not involve customer contact. Dkt. 14-2 ¶¶ 17-19; Dkt. 32 at 30:11-31:2 (testifying that Bozeman stated he was going to work in procurement rather than sales). The question is then whether the allegations regarding Bozeman's contact of a vendor fits within the remaining categories of prohibited conduct of the non-solicitation. The remaining provisions of the non-solicitation clause refer to "any Employee, consultant, contractor, or representative or agent of Beacon or its affiliates" and seeking to terminate, disrupt, or interfere with Dealers Choice's relationship with those persons. Dkt. 10-3. A relationship with a vendor does not appear to fit within the categories of persons that are covered by these two provisions as Dealers Choice clearly sought to preclude solicitation of individuals working for Dealers Choice.

---

[6] Of course, the Court did not have an opportunity to assess Hamsley's credibility because he testified before a different judge. But, in the absence of countervailing evidence, the Court has no basis on which to doubt his truthfulness where he testified under oath. Moreover, despite obviously having contact with this customer and a sufficient relationship with the customer that the customer provided the voicemail to Dealers Choice, Plaintiff did not produce any statement from the customer contradicting the Defendants' suggestion that no solicitation took place.

But, even assuming that a vendor is properly the subject of the non-solicitation clause, there is no allegation that Bozeman sought to terminate, disrupt, or interfere with Dealers Choice's relationship to the vendor. Rather, Plaintiff alleges (again unsupported by any declaration, affidavit, or testimony) that Bozeman "sought to convince this vendor to start a relationship selling through CABP." Dkt. 28 at 3. There is no corollary allegation that Bozeman sought to do so to the detriment of the vendor's relationship with Dealers Choice nor is there an allegation that the vendor would be unable to supply both CABP and Dealers Choice. Thus, the non-solicitation appears not to apply to this contact, and Plaintiff has failed to establish a likelihood of success on the merits with respect to this alleged breach of contract.

c.    *Confidential Information*

In their final attempt to allege a breach of contract, Plaintiff asserts that the Brown and Bozeman Agreements preclude "the retention, use, or disclosure of Dealers Choice's confidential and propriety business information and trade secrets," Dkt. 10 at 23, and that they have "breached, or intend[] to knowingly and willfully breach," their Agreements, Dkt. 1 ¶¶ 124, 136. But the forensic audit that Plaintiff conducted does not support Plaintiff's allegations. At this point, the forensic audit conducted by Plaintiff has revealed only one document sent by either Brown or Bozeman to their personal accounts; namely, Brown's forwarding of the Brown Agreement to his personal email. Dkt. 25-1. Plaintiff does not assert that the Brown Agreement itself was confidential or that it was inappropriate for Brown to send himself a copy of the Brown Agreement so that he could be aware of his obligations under that document.

To the extent that Plaintiff rests its argument here on Brown's indirect contact with a customer through Hamsley, Plaintiff has not established that Brown utilized protectable information. Again, there is no evidence that Brown took any customer list. Moreover, the

21

evidence here is that the customer was already a customer of CABP and that CABP already had the customer's contact information; thus, Plaintiff has failed to demonstrate that the customer's contact information was actually confidential or proprietary, where CABP already had access to the information. Dkt. 14-4 ¶¶ 29-32 (asserting that the customer contacted had been a customer of CABP since 2017 and that the customer's contact information was already in the database).

Furthermore, even assuming *arguendo*, that the customer's phone number could constitute protectable information, a claim regarding the breach of the confidentiality provision appears to fail under both Virginia and Delaware law for separate reasons. The Supreme Court of Virginia has held that former employees who use a list of customers compiled solely from their memories had not misused confidential information, because they "did not . . . utilize any property that belonged to [their former employer] when contacting his customers." *Peace v. Conway*, 246 Va. 278, (1993); *Phoenix Renovation Corp. v. Rodriguez*, 258 F. App'x 526, 538 (4th Cir. 2007) ("Under Virginia law, however, Rodriguez's and Koci's knowledge of Phoenix's customers and their addresses was neither a trade secret nor confidential or proprietary information belonging to Phoenix.").[7] In the absence of any evidence that Brown took any document from Dealers Choice, it appears that Brown provided Hamsley with the customer's number from memory, given their longstanding relationship and apparent friendship. With respect to Delaware law, Delaware "requires a showing of compensable injury," and, thus, where the customer did not leave Dealers Choice, there is no claim. *Commerce Nat'l Ins. Servs., Inc. v. Buchler*, 120 F. App'x 414, 417 (3d

---

[7] Delaware courts have expressed some skepticism regarding an alleged breach of confidentiality agreement based on a former employee's memories but have not been as clear as courts in Virginia. *See Take-A-Break Servs., Inc. v. Grose*, 1990 WL 67392, at *4 (Del. Ch. May 14, 1990) ("Even assuming *arguendo,* but without deciding, that Ms. Grose's recollected knowledge of her former customers and their unique needs and qualities is protectable proprietary information, there is no evidence that Ms. Grose has used, or is using, that information to the detriment of TAB.").

Cir. 2004) (affirming grant of summary judgment on breach of confidentiality claim where customer did not follow former employee).[8]  Thus, at this stage, Plaintiff has not demonstrated a likelihood of success on the merits.

Plaintiff concedes that its other allegations in this regard are speculative.  Mr. Zadrozny acknowledged that he did not have any evidence that Brown or Bozeman took any confidential information with them.  *Id.* at 48:17-49:7.  And, in its briefing, Plaintiff acknowledged that any use of confidential information by Bozeman is "unknown" and that discovery would be necessary "to determine whether Bozeman relied on disclosed any confidential or proprietary information belonging to Dealers Choice."  Dkt. 25 at 3 n. 3.  Moreover, in its opening brief, Plaintiff asserted that Brown and Bozeman "Appear[] Likely to Violate" their confidentiality obligations and *not that they have already violated them*.  Such speculation and supposition cannot meet Plaintiff's burden to demonstrate a likelihood of success on the merits as necessary to support a request injunctive relief.

*    *    *

In sum, the Court need not resolve the choice of law questions with respect to the breach of contract claims because under the plain terms of the contracts Plaintiff has failed to show a likelihood of success on its claims of breach.  Plaintiff has not demonstrated that Brown or Bozeman are working within a seventy-mile radius of a branch that they managed or "worked from."  Plaintiff has not demonstrated that Brown or Bozeman engaged in solicitation as proscribed

---

[8] Plaintiff has sensibly not alleged that the name of the vendor contacted by Bozeman was confidential or proprietary information.  As it appears to the Court that a vendor would likely attempt to market itself and its services, and, as such, the existence of such a vendor or services could not be confidential to Dealers Choice.

by their agreements.  And, finally, Plaintiff has not demonstrated that Brown or Bozeman have retained or used confidential or proprietary information under either Virginia or Delaware law.

ii.     *Breach of Fiduciary Duty and Duty of Loyalty*

The parties both argue Virginia law with respect to the fiduciary duty claims.  Dkts. 10 at 24; Dkt. 14 at 28.  As this Court has previously recognized, to prevail on a breach of fiduciary duty claim, a plaintiff must establish: "(1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) subsequent damages attributable to the breach."  *M Corp. v. Infinitive, Inc.*, 2024 WL 4696132, at *4 (E.D. Va. Nov. 6, 2024).  Plaintiff asserts that Brown and Bozeman have breached their fiduciary duties by "competing unfairly against Dealers Choice, including by sharing Dealers Choice's confidential/proprietary and trade secret information and soliciting Dealers Choice customers whom they learned about during their employment."  Dkt. 10 at 26.  But, as discussed *supra*, such allegations are unsupported by the evidence currently in the record.  As the Court found with respect to the breach of contract claims, Plaintiff has failed to demonstrate that Brown or Bozeman are violating their non-compete clause, are engaging in solicitation of customers or other Dealers Choice employees, or are sharing confidential information with CABP.

The only new allegations with respect to the fiduciary duty claims are allegations that Brown and Bozeman acted disloyally while still employed by Dealers Choice.  But Plaintiff points to no evidence that either one acted in such a manner prior to their resignations.  The forensic audit conducted thus far has revealed no sharing of confidential information with their personal email addresses.  Dkt. 25-1.  Although Dealers Choice asserts that Brown and Bozeman accessed pricing and rebate information prior to their resignations, it does not allege that such access was unusual, unauthorized, or not required by the positions that they then held.  Furthermore, Plaintiff's allegations regarding solicitation of customers and other employees are based on "all of our

24

antennas . . . going up and going, like, what's going on," and it does not know of any "conversations between Bozeman and Brown" regarding leaving for CABP. Dkt. 32 at 29:2-13; *id.* at 51:3-7. These allegations are insufficient, at this stage, to find a likelihood of success on the merits regarding a breach of fiduciary duty.

Additionally, Plaintiff has failed to demonstrate any damages attributable to the alleged breaches. Plaintiff has identified no customer or employee contacted by Brown or Bozeman who has subsequently left Dealers Choice. The Court attempted to probe this element at the evidentiary hearing, and Mr. Zadrozny honestly and credibly asserted that it is "too short of a window to know" and "too soon to really know." Dkt. 32 at 32:12-16; *id.* at 55:23-2. Although Mr. Zadrozny offered a speculation when asked, it was acknowledged to be a speculation. *Id.* at 32:17-21. The Court cannot rely on speculation to support a request for injunctive relief. Accordingly, even if Plaintiff had adequately alleged a breach, Plaintiff has not established any damage flowing from the alleged breaches. Thus, Plaintiff has failed to demonstrate a likelihood of success on the merits of its fiduciary duty claim.

### iii.    *Aiding and Abetting Claims*

It appears that Plaintiff is asserting its aiding and abetting claims under Virginia law. Dkt. 10 at 26 (citing Virginia law). Beginning with Plaintiff's aiding and abetting breach of contract claim, Defendants assert that "aiding and abetting breach of contract (Count V) is not a claim recognized in Virginia." Dkt. 14 at 29. Plaintiff appears to tacitly recognize this in its brief where it only cites the elements for aiding and abetting a breach of fiduciary duty and where it failed to address this point in any subsequent briefing. Dkt. 10 at 26; Dkts. 25, 28, 30. The Court could find no Virginia case supporting the existence of an aiding and abetting a breach of contract claim, and Plaintiff appears to have cited none. *See Power Home Solar, LLC v. Sigora Solar, LLC*, 2021

WL 3856459, at *8 (W.D. Va. Aug. 30, 2021) ("At oral argument, PHS conceded that there is no cognizable action for aiding and abetting a breach of contract under Virginia law.  Count II will therefore be dismissed with prejudice.").  Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits of a noncognizable claim.

Turning to Plaintiff's aiding and abetting breach of fiduciary duty claim, "[u]nder Virginia law, one who aids and abets a third party's breach of fiduciary duty may be held liable for providing such assistance." *Tysons Toyota, Inc. v. Globe Life Ins. Co.*, No. 93-1359, 1994 WL 717598, at *4 (4th Cir. Dec. 29, 1994).  In asserting aiding and abetting claims, a plaintiff must establish the defendant's "(1) actual knowledge of the underlying fiduciary duty and (2) actual knowledge of the breach of that fiduciary duty by the primary tortfeasor." *Best Medical Intern., Inc. v. Wittmer*, 73 Va. Cir. 504, at *2 (2007) (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 660 (2004)).  Moreover, in addition to knowledge of the breach, a "plaintiff must assert that the defendant somehow recruited, enticed, or participated in the fiduciary's breach of its duty." *Halifax Corp.*, 268 Va. at 661.

Here, Plaintiff's claim appears to fail on all fronts.  To begin with, as discussed *supra*, Plaintiff has failed to demonstrate that Brown or Bozeman breached a fiduciary duty.  In any event, even assuming that Plaintiff had established such a breach, each of Plaintiff's allegations regarding CABP's conduct are conclusory and speculative.  *See* Dkt. 1 ("Upon information and belief, CABP caused the former Dealers Choice employees to breach their fiduciary duties and duties of loyalty to Dealers Choice by, among other misdeeds, acting in concert with CABP . . .").  Indeed, other than offering employment to Dealers Choice employees – something that Dealers Choice has apparently done in the reverse[9] – there are no specific allegations regarding anything done by

---

[9] Bozeman was hired away from CABP by Dealers Choice in 2012.  Dkt. 14-2 ¶¶ 4-5.

CABP.  Accordingly, Plaintiff has also failed to establish a likelihood of success on this aiding and abetting claim.

### iv.    *Tortious Interference*

In Count IV, Plaintiff asserts that CABP engaged in tortious interference with an advantageous business and/or contractual relationship. Dkt. 1 at 27.[10]  In this regard, Plaintiff alleges that "CABP was, or should have been, aware of the fact of, and the content of, Dealers Choice's contractual arrangements with its employees and customers." *Id.* ¶ 140.  Plaintiff further alleges that CABP interfered with "the established business relationship between Dealers Choice and its customers/prospects by diverting them to CABP." *Id.* ¶ 144.

As this Court has previously recognized, in Virginia, to prevail on a claim for tortious interference with a business expectancy, a plaintiff must establish "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *M Corp.*, 2024 WL 4696132, at *6.  Plaintiff's argument in this regard is a mere four sentences and is undeveloped.  As an initial matter,

---

[10] Defendants first argue that Plaintiff is unlikely to succeed on its tortious interference claim because "tortious interference with advantageous business relationships" is a "claim Virginia does not recognize." Dkt. 14 at 23.  Although this claim may more commonly be described as "tortious interference with a business expectancy," the Fourth Circuit has used both terms interchangeably.  *See Adnet, Inc. v. Soni*, 66 F.3d 510, 518 (4th Cir. 2023) (describing the "elements of tortious interference with a business relationship in Virginia" as including the "existence of a business relationship or expectancy").  Indeed, Defendants themselves assert that Virginia law recognizes "tortious interference with business expectancy (or prospective business relations)." Dkt. 14 at 23.  Plaintiff may not have utilized the most common verbiage to describe its claim, but this Court cannot say that a reference to "relationships" rather than "relations" deprives Plaintiff of a claim – especially when the Fourth Circuit has used the same terminology.  Accordingly, this argument fails.

Plaintiff's allegations of knowledge are speculative. Plaintiff supplies no facts that supports its allegations that CABP knew of the existence – let alone the *contents* – of Plaintiff's agreements with its employees. Dkt. 1 ¶ 140. As the Fourth Circuit has recognized, a plaintiff must allege facts that moves allegations regarding "knowledge of contractual rights or business expectancies" beyond speculative conclusions. *Lokhova v. Halper*, 995 F.3d 134, 148 (4th Cir. 2021). Here, Plaintiff has failed to move its allegations beyond a speculative level. Moreover, as discussed *supra*, Plaintiff has failed to demonstrate misconduct at this stage of the proceedings as necessary to establish interference with a business expectancy and has failed to establish any non-speculative damages. Accordingly, Plaintiff has failed to demonstrate a likelihood of success on the merits with respect to its tortious interference claim.

v.    *Business Conspiracy*

Plaintiff asserts that all Defendants engaged in a business conspiracy in violation of Virginia Code § 18.2-499 *et seq.* Dkt. 1 at 34. Virginia's business-conspiracy law provides for civil relief if a plaintiff establishes: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring [the] plaintiff in his business; and (2) resulting damage to [the] plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014) (internal citation omitted); *see* Va. Code Ann. 18.2-499–500. "It is not necessary for a plaintiff to prove that the defendant conspirators acted with actual malice, *i.e.*, ill-will, hatred, or spite . . . . Rather, a plaintiff must establish . . . only that the conspirators acted with legal malice, *i.e.*, intentionally, purposely, and without lawful justification." *Dunlap*, 287 Va. at 215 (cleaned up). A cause of action for statutory business conspiracy must be based on an act that is itself wrongful or tortious, not merely a breach of contract. *See id.* at 214–18. And, like fraud, it also must be pleaded with particularity. *Danville Com. Indus. Storage, LLC v. Selective Ins. Co. of S.C.*, 2018 WL 6625078,

28

at *4 (W.D. Va. Dec. 18, 2018) (citing *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d, 700, 706 (E.D. Va. 2004)).

Here, Plaintiff's business conspiracy claim appears to fail on several of the relevant considerations.  First, Plaintiff has not pled the elements with particularity.  *Senture, LLC v. Dietrich*, 2009 WL 10690317, at *8 (E.D. Va. Feb. 27, 2009) ("Fail[ure] to particularly plead the elements of the tort dooms a plaintiff's claim.").  Plaintiff's allegations in this regard are fatally conclusory.  Second, Plaintiff has alleged no facts from which the Court can determine that Defendants acted "willfully and maliciously" to injure Plaintiff.  *Dunlap*, 287 Va. at 214.  Finally, again, the testimony at the evidentiary hearing was that it was too soon to assess any damages to Plaintiff.  Thus, Plaintiff has failed to establish necessary damages for this claim.  Accordingly, Plaintiff has failed to demonstrate a likelihood of success on its business conspiracy claim.

*     *     *

In sum, Plaintiff has failed to establish a likelihood of success on the merits of any of its claims.  Although this alone is fatal to Plaintiff's request for injunctive relief, the Court will briefly address the remaining elements.

### B.     The Remaining *Winter* Factors

In addition to failing to establish likelihood of success on the merits, Plaintiff has failed to establish irreparable harm.  Plaintiff has not established any harm as of yet, and it appears that CABP has provisions in place to attempt to preclude the very harms that Plaintiff asserts are likely to occur.  *See* Dkt. 14-4 ¶ 26 (discussing CABP policies).  As Defendants correctly note, at this time, Plaintiff's claims of irreparable harm are speculative.  *Bank of Am. Inv. Servs., Inc. v. Byrd*, 2009 WL 10184606, at *6 (E.D. Va. June 15, 2009) (denying preliminary injunction where plaintiff "offers no evidence of loss of goodwill, damage to its reputation, the past loss of a single

customer" or "the likelihood of the future loss of customer").  Given the lack of identifiable harm, the balance of the equities also favors Defendants, as an injunction would effectively prevent Bozeman and Brown from continuing their employment.  Plaintiff has also not established that public interest favors Plaintiff.  Accordingly, each of the other *Winter* factors also supports denying Plaintiff's Motion.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Emergency Motion for a TRO (Dkt. 9) is DENIED.

It is SO ORDERED.

Alexandria, Virginia
December 23, 2025

/s/

Rossie D. Alston, Jr.
United States District Judge